**COHELAN KHOURY & SINGER**
Timothy D. Cohelan, Esq. (SBN 60827)
tcohelan@ckslaw.com
Isam C. Khoury, Esq. (SBN 58759)
ikhoury@ckslaw.com
605 C Street, Suite 200
San Diego, CA 92101
Telephone: (619) 595-3001/Facsimile: (619) 595-3000

**KEEGAN & BAKER, LLP**
Patrick N. Keegan, Esq. (SBN 167698)
pkeegan@keeganbaker.com
2292 Faraday Avenue, Suite 100
Carlsbad, CA 92008
Telephone: (760) 929-9303/Facsimile: (760) 929-9260

Attorneys for Plaintiff BELINDA FOLEY

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BELINDA FOLEY, individually and on behalf of class of similarly situated individuals,<br><br>    Plaintiff,<br><br>    v.<br><br>CALIFORNIA PHYSICIANS' SERVICE, doing business as, BLUE SHIELD OF CALIFORNIA,<br><br>    Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR DAMAGES**<br><br>**JURY TRIAL DEMANDED** |

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

Plaintiff Belinda Foley, on behalf of herself and a class of similarly-situated individuals as defined below, and based on Plaintiff's knowledge of facts pertaining to herself and her own actions, and otherwise based upon information and belief, allege the following against California Physicians' Service, doing business as Blue Shield of California ("BSCA" or "Defendant"), who owns and controls blueshieldca.com and related webpages (its "Website").

## INTRODUCTION

1.    This class action lawsuit arises out of BSCA's undisclosed, illegal policy and practice during the proposed Class Period (i.e., the applicable limitations period preceding the filing of the Complaint in this matter and through and including between April 2021 and January 2024) of embedding and using various trackers on Defendant's Website, to (1) install and store third-party tracker cookies on website users' browsers and (2) collecting, disclosing and sharing with third parties Website users' browser and device data as well as personally identifiable information ("PII"), such as IP addresses[1], and protected health information ("PHI") (collectively referred to as "Private Information") that Defendant then surreptitiously discloses to and shares with unauthorized third parties, including Google LLC ("Google") and (2) aiding and abetting Google's (and possibly other third party interceptors') unauthorized intercepting, recording, collection and use of California residents' highly personal and confidential data and communications, including Plaintiff's and other Class (defined *infra*) members' Private Information. Defendant did all of this without users' knowledge, authorization, or consent.

2.    BSCA's unauthorized disclosures of Private Information occurred because of its use of tracking technologies that BSCA installed on BSCA's websites, including but not limited to the Google Analytics tool, Google Ads tool, and other related tracking tools (collectively, "Tracking Technologies" or "Tracking Tools").

3.    Plaintiff and Class members who visited the BSCA website expected that their Private Information would remain private and confidential. Plaintiff and Class members had a

---

[1]  IP addresses have been classified by the United States Department of Health and Human Services ("HHS") as personally identifying information. *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. Department of Health and Human Services (Dec. 1, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online- tracking/index.html

reasonable expectation that their interactions and communications with and through BSCA's website would not be shared with any third parties, let alone to undisclosed third parties.

4.      Unbeknownst to individuals using the BSCA platform, Google Analytics code is embedded into the BSCA website. Through that embedded Tracking Technologies, while Plaintiff and Class members were and are interacting with the BSCA website, Google, in real time, is able to and does intercept, eavesdrop upon, and collect BSCA website users' sensitive information, including their protected mental health information. All of this happens without the knowledge of the individual, and certainly without any choice or consent.

5.      Unbeknownst to individuals entering and viewing BSCA website during the proposed Class Period, third-party trackers were embedded into Defendant's website. Through embedded Tracking Technologies, while Plaintiff and Class Members were accessing and interacting with Defendant's BSCA website, Defendant (1) installed and stored third-party tracker cookies on users' browsers and (2) captured BSCA website users' browser and device data, IP addresses and other Private Information. All of this happened the moment users entered Defendant's BSCA website and without any further action required by or requested of the users. Stated another way, as Plaintiff and Class Members are using their various electronic devices to enter their Private Information, Google simultaneously is intercepting their Private Information in real time while it is in transit by using the embedded Tracking Technologies' code. And it happened without any meaningful notice, any choice or consent.

6.      Stated another way, as Plaintiff and Class Members are using their various electronic devices to enter their Private Information, Google simultaneously is intercepting their Private Information in real time while it is in transit by using the embedded Tracking Technologies' code. Moreover, because BSCA failed to turn on the IP (internet protocol) anonymization feature on its website, Google was and is able to identify, from the intercepted data, individual BSCA website users' IP addresses and to access and obtain their Private Information.

7.      Plaintiff is informed and believes, and on that grounds alleges, that Defendant surreptitiously shared identifying data, including addressing information such as IP addresses

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

and other Private Information, with the third-party trackers for advertising and analytics-related purposes. Defendant did so without obtaining BSCA website's users' authorization or consent and without a court order.  Indeed, BSCA has conceded in its own communications  sent to Plaintiff and other Class members (described *infra*) that "It is reasonably believed that certain elements of your protected health information may have been accessed, acquired, used, or disclosed to a third party…. On February 11, 2025, Blue Shield discovered that, between April 2021 and January 2024, Google Analytics was configured in a way that allowed certain member data to be shared with Google's advertising product, Google Ads, that likely included protected health information. Google may have used this data to conduct focused ad campaigns targeted back to you."

8.     Defendant's unauthorized (1) installation of third-party tracker cookies on users' web browsers and (2) collection and disclosure to third parties of Plaintiff's and Class members' Private Information allowed Plaintiff's and Class members' Private Information to be accessed, acquired, used, or disclosed to at least one unauthorized third party, all without consent or adequate notification to Plaintiff and Class Members, were invasions of Plaintiff's and Class members' privacy. Defendant's actions also violated multiple laws, including the California Computer Data Access and Fraud Act, Cal. Penal Code § 502 ("CDAFA"); the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq*. ("CIPA"); and the right to privacy under Article 1, § 1, of the California Constitution, which includes privacy as one of six fundamental rights of all Californians.

## PARTIES

**A.     Plaintiff Belinda Foley**

9.     Plaintiff Belinda Foley is a natural person and an adult resident and citizen of California. While physically present in California, Plaintiff used an internet browser on her computer and on her cellular phone to access Defendant's BSCA website on several occasions during the last three years, including between April 2021 and January 2024, to access or input her iinsurance plan name, type and group number; name, city, zip code; gender; family size; Blue Shield assigned identifiers for your online account; medical claim service date and service

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

provider, patient name, and/or patient financial responsibility; and/or "Find a Doctor" search criteria and results (location, plan name and type, provider name and type).

10.    At no time when Plaintiff entered Defendant's BSCA website and viewed its contents during the proposed Class Period did she authorize or consent to Defendant installing third-party tracker cookies on her internet browser or computer. Plaintiff also did not consent to Defendant sharing or selling her browser and device data, IP addresses and other Private Information with or to third-party trackers. Further, because Defendant did not provide notice or request permission or authorization, Plaintiff was unaware of and had no meaningful opportunity to opt out of or object to that unauthorized disclosure of her data and other Private Information.

**B.    Defendant and its BSCA Website**

11.    Defendant California Physicians' Service doing business as Blue Shield of California, ("Defendant" or "BSCA") is a mutual benefit corporation and health plan, founded in 1939 by the California Medical Association. It is headquartered in Oakland, California, and serves 4.5 million health plan members and more than 77,000 physicians across the state. Defendant systematically and continuously does business in California and with California residents.

12.    Defendant currently owns and operates its blueshieldca.com and related webpages (its "Website"), which allows Plaintiff and other Class members to use its Website for the following:

- Access information about doctors, specialists, and hospitals within BSCA's PPO, HMO, dental, and vision networks, and facilitate telehealth appointments and provide resources for mental health care;
- Enabling members to file claims online and track their status;
- Pay their premiums;
- Review details about their health plans, including coverage options for Medi-Cal, Medicare, and other insurance plans;

Class Action Complaint

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

- To find urgent care facilities, compare costs for different services, and prepare for non-emergency medical needs.

13.    During the proposed Class Period, Defendant's Website failed to put visitors on notice of Defendant's use of Website Tracking Technologies. Upon information and belief, Plaintiff alleges that Defendant's use of Website Tracking Technologies allow companies like Google to receive, store and analyze Private Information collected from Website visitors.

14.    During the proposed Class Period, Defendant's Website also failed to disclose the selling and sharing of browser and device data and PII, including IP addresses and other addressing information, to and with unauthorized third party-trackers for advertising and other purposes.

## JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction over this action under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d) because the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and a member of the Class is a citizen of a different state than BSCA. This Court also has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under 18 U.S.C. § 2510, et seq. (the Electronic Communications Privacy Act). This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367 because the state law claims form part of the same case or controversy under Article III of the United States Constitution. This Court has personal jurisdiction over BSCA because its corporate headquarters is located in this District, and venue is proper in this District because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

16.    This Court has personal jurisdiction over BSCA because its corporate headquarters is located in this District, and venue is proper in this District because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

17.    This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367 because the state law claims form part of the same case or controversy under Article III of the United States Constitution. Article III standing is met when a plaintiff "(1)

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

Class Action Complaint

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 337, 338 (2016).

18.     Plaintiff meets the "injury in fact" requirement because her invasion of privacy is a "concrete and particularized" injury. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021) ("Various intangible harms can also be concrete [including] . . . disclosure of private information"); *In re Facebook Inc. Internet Tracking Litig.*, 956 F.3d 589, 596 (9th Cir. 2020) (holding that Facebook's tracking of browsing histories that were sold to advertisers was an "invasion of [a] legally protected interest that is concrete and particularized."). Plaintiff alleges that she was personally injured when Defendant impermissibly obtained Plaintiff's personal information. It is black-letter law that such allegations are sufficient to confer Article III standing. *See, e.g., Mastel v. Miniclip SA*, 2021 WL 2983198, at *6 (E.D. Cal. July 15, 2021) (collection of "personal information without the plaintiff's consent involve a sufficiently 'concrete' injury"); *In re Facebook, Inc., Consumer Privacy User Profile Litig.*, 402 F.Supp.3d 767, 784 (N.D. Cal. 2019) (dissemination to third parties of plaintiffs' personal information is "sufficient to confer [Article III] standing."). Separate from an invasion-of-privacy harm, Plaintiff also alleges economic harm sufficient for Article III standing by alleging user data carries financial value, citing a study that values user data at a quantifiable number; and allegations that Defendant profited from the data. The Ninth Circuit has found that such allegations are sufficient to establish Article III standing under a theory of economic harm. *See Facebook Tracking*, 956 F.3d at 600. Further, "[u]nder California law, this stake in unjustly earned profits exists regardless of whether an individual planned to sell his or her data or whether the individual's data is made less valuable." *Facebook Tracking*, 956 F.3d at 600. Plaintiffs' injury is "fairly traceable" to Defendant's challenged conduct, *Spokeo*, 578 U.S. at 338, because Plaintiff's private information was acquired by Defendant through the use of third-party trackers are embedded into Defendant's website. Thus, Plaintiff's injury thus occurred at the moment her information was improperly acquired by Defendant. Plaintiff meets the redressability element because courts have consistently recognized that violation of privacy

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

rights can be redressed by an award of damages or injunctive relief. *See Facebook Privacy*, 402 F.Supp.3d at 784 ("[T]he Ninth Circuit has repeatedly explained that intangible privacy injuries can be redressed in the federal courts."); *Jewel v. Nat'l Sec. Agency*, 673 F.3d 902, 912 (9th Cir. 2011) (similar). Additionally, the injunctive relief Plaintiff seeks includes terminating all downstream distributions of such personal data illegally collected, which would redress future harms suffered by Plaintiff and the Class.

19. Plaintiff adequately alleges statutory standing to bring California Invasion of Privacy Act ("CIPA") claim against the Defendant website owner arising from website's downloading of software "trackers" onto Plaintiff's web browser, constituting unauthorized "pen registers" under CIPA, where Plaintiff alleges that collection of her internet protocol ("IP") addresses through the trackers allowed third parties to obtain personally identifying, non-anonymized information, that IP addresses revealed geographical location and other personal information sufficient for third parties to conduct targeted advertising, that Plaintiff was unaware of the tracking, and that Plaintiff did not consent to it. *See*, *Shah v. Fandom, Inc*., 2024 WL 4539577 (N.D. Cal., Oct. 21, 2024, No. 24-CV-01062-RFL).

20. Pursuant to L.R. 3-2(c), assignment to this division is proper because a substantial part of the conduct which gives rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS COMMON TO THE CLASS

### A. Website Tracking Technology

21. Trackers collect information about internet users as those users browse the web. Trackers use cookies, scripts or pixels inserted by publishers or advertisers. Tracker profiling is the process of linking data from different websites to build user profiles based on browsing history, to place users in groups, and to sell that data to third parties for targeted advertising.

22. There is a broad range of online technologies that track and monitor internet-based interactions and communications. Four identifier tools commonly used are (i) website cookies, (ii) tracking pixels, (iii) digital fingerprinting, and (iv) software development kits.

23. A website cookie refers to a small text file that a website server creates and transmits to a web browser (e.g., Chrome or Safari) which then installs and stores the file in a

particular directory on an individual's computer, phone or other device.[2] When a website user attempts to access a webpage, the user's browser transmits a communication to the website's server requesting that the server display the website's content for the browser to load. While providing the requested content to the user, the website's server also provides the cookies that it would like the user's browser to install and retain.

24.    Website cookies contain information that identifies the domain name of the webserver that wrote the cookie (e.g., hulu.com or facebook.com). Cookies also have information about the user's interaction with a website, such as how the website should be displayed, how many times a user has visited the website, how long a user spends on a webpage, information about what pages the user visited, and authentication information. In addition to a unique identifier and a site name, website cookies also can include personally identifiable information such as a user's name, address, email address and/or telephone number if that information was provided to a website.

25.    A first-party cookie is implemented by the website that the user accesses. The website uses its cookies for authentication, monitoring user sessions, and collecting analytical data. A third-party cookie, also called an "advertising cookie" or a "tracker cookie," is a cookie that belongs to a domain other than the one being displayed to the user in her or her browser. A third-party cookie typically is used for cross-site tracking, retargeting and ad-serving. The key differences between the first- and third-party cookies are who sets them (i.e., a website display host or a third party), whether and how they can be blocked by a web browser, and the availability of the cookie. A third-party advertising or tracker cookie is accessible on any website that loads the third-party server's code.

26.    A pixel, also known as a "tracking pixel," "web bug," "clear GIF," or "web beacon," is similar to a website cookie, and is a small, almost-invisible image (pixel) embedded in a website or an email to track a user's activities. That tracked data often includes the user's operating system, the type of website or email used, the time when the website was accessed, the user's IP address, and whether there are cookies that previously have been set by the server

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

---

[2]  See Sara J. Nguyen, *What Are Internet Cookies and How Are They Used?*, All About Cookies (Jul. 28, 2023), https://allaboutcookies.org/what-is-a-cookie.

hosting the pixel image.[3]

27.    Digital fingerprinting refers to device fingerprinting and browser fingerprinting, both of which send information to the website server to help ensure that a website is displaying content and operating appropriately. Although a browser or device does not usually transmit personal information about a user, most fingerprinting is performed via a third-party tracker, which can track an individual across multiple sites and form a profile of the user.[4]

28.    A software development kit ("SDK") is a set of computer programs and similar tools that developers and engineers can leverage to build applications for specific platforms. The SDK often includes, among other tools, libraries, application programming interfaces, instructions, guides, directions and tutorials.[5] SDKs also may have embedded code that allows them to intercept personal data and other information from application users surreptitiously, including geolocation data, usernames and communications derived from other SDK applications installed on a user's device, and a user's activities within an application after installation.

29.    All of the information and data captured and collected by third-party trackers, regardless of the tool used, can be sold and used for marketing and advertising purposes.

**B.    Internet Protocol Addresses ("IP Addresses")**

30.    One important piece of identifying information collected by third-party trackers is a website user's IP address. An IP address is a unique identifier for a device, which is written as four sets of numbers separated by periods (e.g., 123.145.167.189). The first two sets of numbers reflect what network the device is on, and the second two sets of numbers identify the specific device. The IP address enables a device to communicate with another device, such as a computer's web browser communicating with a website server.

31.    Similar to a telephone number, an IP address is a unique numerical code associated with a specific internet-connected device on a computer network. The IP address

---

[3]  See Patti Croft & Catherine McNally, *What Is a Web Beacon and Why Should You Care?*, All About Cookies (Sept. 26, 2023), https://allaboutcookies.org/what-is-a-web-beacon.

[4] See Anokhy Desai, *The Half-Baked Future of Cookies and Other Tracking Technologies*, IAPP (July 2023), https://iapp.org/resources/article/future-of-cookies-tracking-technologies/.

[5] *What Is an SDK? Software Development Kits Explained*, Okta, Inc. (June 30, 2022), https://www.okta.com/identify-101/what-is-an-sdk.

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

identifies all of the devices accessing a certain network at any given time.

32.    Significantly, an IP address contains geographical location information from which the state, city and zip code of a specific device can be determined. Given the information that it can and does reveal, an IP address is considered personally identifiable information and is subject to HIPAA protection.[6]

33.    Knowing a website user's IP address, and therefore the user's geographic location, provides "a level of specificity previously unfound in marketing."[7] An IP address allows advertisers to target customers by countries, cities, neighborhoods and postal code.[8] Even more specifically, it allows advertisers to target specific households, businesses and even individuals with ads that are relevant to their interests.[9]

34.    Indeed, IP targeting is one of the most successful marketing techniques that companies can employ to spread the word about a product or service because companies can use an IP address to identify individuals personally.[10] By targeting specific households or businesses, a company can avoid wasting money on ads that are unlikely to be seen by their target audience and can reach their target audience with greater precision.[11] Additionally, by analyzing data on which households or businesses are responding to their ads, IP address targeting can help businesses improve their overall marketing strategies and refine their marketing efforts.[12]

35.    As alleged below, Defendant installed third-party tracker cookies on BSCA Website users' browsers. Those trackers unlawfully have collected browser and device data as well as identifying and addressing information about Plaintiff and Class members, including

---

[6] See 45 C.F.R. § 164.514(b)(2)(i)(O).

[7] *IP Targeting: Understanding This Essential Marketing Tool*, AccuData, https://www.accudata.com/blog/ip-targeting/ (last visited April 17, 2024).

[8] *Location-based Targeting That Puts You in Control*, Choozle, https://choozle.com/geotargeting-strategies/ (last visited April 17, 2024).

[9] Herbert Williams, *The Benefits of IP Address Targeting for Local Businesses*, LinkedIn (Nov. 29, 2023), https://www.linkedin.com/pulse/benefits-ip-address-targeting-local-businesses-herbert-williams-z7bhf/

[10] Trey Titone, *The future of IP address as an advertising identifier*, Ad Tech Explained (May 16, 2022), https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/

[11] Herbert Williams, *The Benefits of IP Address Targeting for Local Businesses*, LinkedIn (Nov. 29, 2023), https://www.linkedin.com/pulse/benefits-ip-address-targeting-local-businesses-herbert-williams-z7bhf/

[12] *Id.*

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

their IP addresses, all without a court order or Plaintiff's or Class members' consent.

**C.    Defendant's Use of Third-Party Trackers on its BSCA Website**

36.    BSCA's unauthorized disclosures of Private Information occurred because of its use of tracking technologies that BSCA installed on BSCA's websites, including but not limited to the Google Analytics tool, Google Ads tool, and other related tracking tools (collectively, "Tracking Technologies" or "Tracking Tools"). The Tracking Technologies allow unauthorized third parties to intercept the contents of patients' communications, receive and view patients' Private Information, mine it for purposes unrelated to the provision of healthcare, and further monetize it to deliver targeted advertisements to specific individuals. By installing those Tracking Tools and their corresponding tracking cookies, Defendant can sell advertising space on BSCA Website. Doing that enables Defendant to monetize its Website further and earn additional revenue.

37.    Google markets Google Analytics as a platform that offers "a complete understanding of your customers across devices and platforms" to "uncover new insights and anticipate future customer actions with Google's machine learning to get more value out of your data." (Analytics, Google Marketing Platform, https://marketingplatform.google.com/about/analytics/). Google Analytics collects data from a website or application to create reports that provide insights into a business.

38.    In order to get that benefit, a website like BSCA's must add or embed a small piece of JavaScript measurement code into each page of the site. The code intercepts a user's interaction in real-time as the user navigates the page, including intercepting any information that the user may input and what links the user clicked. The measurement code also collects information from the browser, such as the language setting, the type of browser and the device and operating system on which the browser is running. It even can collect and record the "traffic source," which is what brought the user to the site in the first place. (How Google Analytics Works, Google Analytics Help, https://support.google.com/analytics/answer/12159447?hl=en&ref_topic=12156336,12153943, 2986333,&sjid=478430351580570002-NA&visit_id=638186454308763581-

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

3109655727&rd=1). The "traffic source" could be, e.g., a search engine, an advertisement that the visitor clicked, or an email marketing campaign. Thus, Plaintiff's and Class Member's Private Information would not have been disclosed to Google via this technology but for BSCA's decision to install Google Analytics on its Website, which cause Plaintiff's and Class Members' Private Information to be intercepted, duplicated, and re-directed to Google.

39.     All of this information, including Plaintiff's and Class Members' Private Information, is sent simultaneously, while in transit, to Google for processing. Once Google Analytics processes the data, it aggregates and organizes the data based on particular criteria. The criteria can be customized by applying filters.

40.     After the data has been processed and stored in the Google database, Google uses the data to generate reports to help analyze the data collected. This includes reports on acquisition (e.g., information about where the traffic originated and the methods by which users arrived at a site), engagement (what web pages and app screens a user visited), and demographics (a user's age, location, language, gender, and interests expressed when browsing online and engaging in purchase activities).

41.     In addition to using the data collected to provide its services, Google also uses the information shared by sites like BSCA's to maintain and improve Google's own services, develop new services, measure the effectiveness of advertising, and personalize content and ads that one sees on Google's and its partners' sites and applications.

42.     While seeking and using BSCA's services as a medical provider, Plaintiff and Class Members communicated their Private Information to BSCA via its Website. Plaintiff and Class members were not aware that their Private Information would be shared with third parties as it was communicated to BSCA because, amongst other things, BSCA did not disclose this fact. Plaintiff and Class members never consented, agreed, authorized, or otherwise permitted BSCA to disclose their Private Information to third parties, nor did they intend for anyone other than BSCA to be a party to their communications (many of them highly sensitive and confidential) with BSCA.

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

Class Action Complaint

43.     BSCA's Tracking Tools sent non-public Private Information to third parties like Facebook and Google, including but not limited to Plaintiff's and Class Members': (1) status as medical patients; (2) health conditions; (3) desired medical treatment or therapies; (4) desired locations or facilities where treatment was sought; (5) phrases and search queries (such as searches for symptoms, treatment options, or types of providers); (6) searched and selected physicians and their specialties conducted via the general search bar; and (7) other information related to their healthcare treatment and conditions.

44.     Importantly, the Private Information that BSCA's Tracking Tools sent to third parties included PII that allowed those third parties to connect the Private Information to a specific patient. Information sent to Google was sent alongside the Plaintiff's and Class members' unique identifier ("ga" or "CID"), thereby allowing individual patients' communications with BSCA, and the Private Information contained in those communications, to be linked to their unique Google accounts and therefore their identity. See, *Brown v. Google LLC*, 525 F. Supp. 3d 1049 (N.D. Cal. 2021) (citing internal evidence from Google employees). Google also connects user data to IP addresses; IP addresses have been classified by the United States Department of Health and Human Services ("HHS") as personally identifying information. (Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates, U.S. Dept of Health and Hum. Servs. (Dec. 1, 2024), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-racking/index.html).

45.     Similarly, Google users who are logged-in to their Google accounts also have an identifier that is stored in Google's logs. Google logs a user's browsing activities on non-Google websites and uses these data for serving personalized ads.

46.     By installing and implementing Google Analytics, BSCA caused Plaintiff's and Class Member's communications and Private Information to be intercepted by and/or disclosed to Google and for those communications to be personally identifiable. These unlawful transmissions are initiated by BSCA's source code concurrent with communications made via certain webpages.

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

47.     BSCA has conceded these facts. On April 4, 2025, BSCA sent a text message to Plaintiff which stated the same information as in the email sent to her on April 10, 2025.

48.     On April 10, 2025, BSCA sent an email message to Plaintiff which stated in part the following:

Dear Belinda,

We are writing to inform you about a potential data breach. It is reasonably believed that certain elements of your protected health information may have been accessed, acquired, used, or disclosed to a third party. Due to the complexity and scope, we are unable to confirm whether your specific information was affected but are sending this notice out of an abundance of caution. Blue Shield assures you that we take this matter very seriously. We have taken measures to safeguard against similar future disclosures.

**What Happened**

Like other health plans, Blue Shield historically used the third-party vendor service, Google Analytics, to internally track website usage of members who entered certain Blue Shield sites. We were doing this to improve the services we provide to our members.

On February 11, 2025, Blue Shield discovered that, between April 2021 and January 2024, Google Analytics was configured in a way that allowed certain member data to be shared with Google's advertising product, Google Ads, that likely included protected health information. Google may have used this data to conduct focused ad campaigns targeted back to you. We want to reassure you no bad actor was involved, and, to our knowledge, Google has not used your information for any purpose other than these ads or shared your protected information with anyone.

Blue Shield severed the connection between Google Analytics and Google Ads on its websites in January 2024. We have no reason to believe that any member data has been shared from Blue Shield's websites with Google after the connection was severed. Upon discovering the issue, Blue Shield immediately initiated a review of its websites and security protocols to ensure that no other analytics tracking software is impermissibly

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

sharing members' protected health information.

**What Information Was Involved**

The information that may have been impacted includes the following:

Insurance plan name, type and group number; city; zip code; gender; family size; Blue Shield assigned identifiers for your online account; medical claim service date and service provider, patient name, and patient financial responsibility; and "Find a Doctor" search criteria and results (location, plan name and type, provider name and type).

There was no disclosure of other types of personal information, such as your Social Security number, driver's license number, or banking or credit card information.

**What We Are Doing**

We understand receiving a notice such as this can create concern, and we regret that your personal information may have been shared without your authorization. Blue Shield takes the security of your information very seriously, and we are committed to maintaining your privacy.

49.     On April 9, 2025, BSCA also published a "Notice of Data Breach" on its News Center portion of its Website which stated in part the following:

Blue Shield of California has begun notifying certain members of a potential data breach that may have included elements of their protected health information. Due to the complexity and scope of the disclosures, Blue Shield is unable to confirm whether any particular member's specific information was affected. Out of an abundance of caution, Blue Shield is providing notice to all members who may have accessed their member information on the potentially impacted Blue Shield websites during the relevant time frame. Blue Shield takes this matter very seriously and has already initiated measures to safeguard against similar future disclosures.

**What happened**

Like other health plans, Blue Shield historically used the third-party vendor service, Google Analytics, to internally track website usage of members who entered certain Blue Shield sites. We were doing this to improve the services we provide to our

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

members.

On February 11, 2025, Blue Shield discovered that, between April 2021 and January 2024, Google Analytics was configured in a way that allowed certain member data to be shared with Google's advertising product, Google Ads, that likely included protected health information. Google may have used this data to conduct focused ad campaigns back to those individual members. We want to reassure our members that no bad actor was involved, and, to our knowledge, Google has not used the information for any purpose other than these ads or shared the protected information with anyone.

Blue Shield severed the connection between Google Analytics and Google Ads on its websites in January 2024. We have no reason to believe that any member data has been shared from Blue Shield's websites with Google after the connection was severed. Upon discovering the issue, Blue Shield immediately initiated a review of its websites and security protocols to ensure that no other analytics tracking software is impermissibly sharing members' protected health information.

**What information was involved**

The information that may have been impacted includes the following:

Insurance plan name, type and group number; city; zip code; gender; family size; Blue Shield assigned identifiers for members' online accounts; medical claim service date and service provider, patient name, and patient financial responsibility; and "Find a Doctor" search criteria and results (location, plan name and type, provider name and type).

(https://news.blueshieldca.com/notice-of-data-breach (last visited April 15, 2025).

50.     BSCA's characterization of this incident as a "data breach" is specious. There is no hacker or "bad actor" who obtained unauthorized access to BSCA's Website without BSCA's permission. Instead, BSCA voluntarily "used the third-party vendor service, Google Analytics, to internally track website usage of members who entered certain Blue Shield sites" and "between April 2021 and January 2024, Google Analytics was configured in a way that allowed certain member data to be shared with Google's advertising product, Google Ads, that

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

likely included protected health information," which "Google may have used this data to conduct focused ad campaigns targeted back to you."

51.    Additionally, BSCA's characterization of its use of Google Analytics was permissible or that its use was "Like other health plans" is disingenuous. Patient healthcare data in the United States is protected by federal law under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), 42 U.S.C. § 1320d-6, and its implementing regulations, which are promulgated by the U.S. Department of Health and Human Services ("HHS"). The Office for Civil Rights (OCR) at HHS issued a Bulletin to highlight the obligations of HIPAA covered entities and business associates ("regulated entities") under the HIPAA Privacy, Security, and Breach Notification Rules ("HIPAA Rules") when using online tracking technologies ("tracking technologies"), such as Google Analytics and the other Tracking Technologies used by BSCA here. (*Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, https://www.hhs.gov/ hipaa/forprofessionals/privacy/guidance/hipaa-online-tracking/index.html) (Content last review -ed by OCR June 26, 2024) (Content last visited April 16, 2024) (hereinafter, the "Bulletin"). The Bulletin expressly provides that "**Regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules.** For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures." "While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, because of the proliferation of tracking technologies collecting sensitive information, OCR is providing this reminder that it is critical for regulated entities to ensure that they disclose PHI **only** as expressly permitted or required by the HIPAA Privacy Rule." "Therefore, a regulated entity must configure any user-authenticated webpages that include tracking technologies to allow such technologies to **only** use and disclose PHI in compliance with the HIPAA Privacy Rule and must ensure that the electronic protected health information (ePHI) collected through its website is protected and secured in accordance with the HIPAA

Security Rule," citing 45 CFR part 164, subparts A and C. (Bold in the original; footnotes omitted). In other words, OCR of HHS has expressly stated that BSCA's use of Google Analytics and the other Tracking Technologies in the manner set forth in its "Notice of Data Breach" violates HIPAA Rules.

52.    The Bulletin also warns that BSCA's use of Google Analytics and the other Tracking Technologies in the manner set forth in its "Notice of Data Breach" would cause Plaintiff and other members of the Class to suffer other damages: "An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment." (Footnotes omitted).

53.    Moreover, it is well known that there is an economic market for a consumer's personal data, with personal medical information being one of the most valuable categories of data.

54.    In a 2014 article by the Federal Trade Commission, the agency detailed the value of user data, particularly health information, and found that data brokers sell data in sensitive categories for a premium. (*Data Brokers, A Call For Transparency And Accountability, Federal Trade Commission*, (May 2014), https://www.ftc.gov/system/files/ documents/reports/data-brokers-call-transparency-accountability-report-federal-trade-commission-may-2014/140527databrokerreport.pdf). The FTC subsequently brought a lawsuit against one of the data brokers for selling location data regarding people who visit abortion clinics for approximately $160 for a week's worth of data.

55.    In 2021, a report from *Invisibly* noted that "because health care records often feature a more complete collection of the patient's identity, background, and personal

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

Class Action Complaint

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

identifying information (PII), health care records have proven to be of particular value to criminals." (*How Much is Your Data Worth? The Complete Breakdown for 2021*, *Invisible*, (July 13, 2021), https://www.invisibly.com/learn-blog/how-much-is-data-worth/).   The article further explained that "while a single social security number might go for $0.53, a complete health care record sells for $250 on average." Health care data breaches increased by 55% in 2020.

56.     Plaintiff's and Class members' Private Information, including their protected medical information, have a recognized monetary value. BSCA's unauthorized disclosure and Google's interception of that sensitive medical information have deprived Plaintiff and Class members of the economic value of their personal property without proper consideration.

57.     BSCA has also deprived Plaintiff and Class Members of their privacy rights when it: (1) implemented Google Analytics that surreptitiously tracked, recorded, and disclosed Plaintiff's and other online patients' confidential communications and Private Information; (2) disclosed patients' protected information to unauthorized third parties; and (3) undertook this pattern of conduct without notifying Plaintiff or Class Members and without obtaining their express written consent.

**D.     Plaintiff and Class Members Did Not Consent to Defendant's Disclosure of Their Personally Identifying and Addressing Information, and They Had and Have a Reasonable Expectation of Privacy in Their User Data**

58.     During the proposed Class Period, Defendant did not ask its BSCA website visitors, including Plaintiff, whether they consented to having their personally identifying and addressing information disclosed to and used by third parties like Google. When a website user accessed and entered Defendant's Website during the proposed Class Period, there was no pop-up window or other notification to inform users that Defendant was using website tracking technology or installing third-party tracker cookies.

59.     Additionally, the third-party trackers were incorporated seamlessly – and, to users, invisibly – in the background on BSCA website. That seamless and invisible incorporation gave Plaintiff and Class Members no way of knowing that Defendant was collecting their browser and device data and Private Information, including their IP addresses,

and secretly sharing that information with undisclosed third parties.

60.    Unlike first-party cookies that might be technologically necessary to enable a computer user to view a webpage, third-party tracker cookies are not necessary. Moreover, they (1) simultaneously communicate information to an external server as a user navigates a website; (2) track users across devices, meaning that a user's actions on multiple devices all will be included in the information stored regarding that user; (3) are not easily disabled by users; and/or (4) create a record of all of the information that users provide to and/or receive from the website. Because they were unaware of Defendant's use of third-party trackers and tracking cookies, Plaintiff and Class Members could not and did not consent to the collection, storage and use of their personally-identifying and addressing information by undisclosed third parties like Google.

61.    During the proposed Class Period, Plaintiff and Class Members had a reasonable expectation of privacy in their interactions with Defendant's Website and in their user data, especially their Private Information. That is even truer of Plaintiff's and Class Members' IP addresses, which contain geolocation data that can be used to identify, track and target individuals in a very specific way.

62.    Privacy studies, such as those conducted by the Pew Research Center, show that most Americans are concerned about how data is collected about them.[13] Those privacy polls also reflect that Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares data regarding a customer or other individual.

63.    Indeed, according to Consumer Reports, more than 90% of Americans believe that more should be done to ensure that companies protect consumers' privacy. Further, a supermajority of Americans – 64% – believe that companies should be prohibited from sharing data with third parties, while 63% of Americans want a federal law requiring companies to

---

[13] Brooke Auxier et al., *Americans and Privacy: Concerned, Confused and Feeling Lack of Control Over Their Personal Information*, Pew Research Center (Nov. 15, 2019), https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confused-and-feeling-lack-of-control-over-their-personal-information/

Class Action Complaint

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

obtain a consumer's permission before sharing a consumer's information. To that end, 60% of Americans believe that companies should be required to be more transparent about their privacy policies so that consumers can make more informed choices.[14]

64.     Users act in a manner that is consistent with those preferences. During a rollout of new iPhone operating software, for example, 94% of U.S. users who were asked for clear, affirmative consent before allowing companies to track them chose not to share their data.[15]

65.     Defendant's unauthorized (1) installation of third-party tracker cookies on Plaintiff's and Class Members' web browsers and (2) collection and disclosure of Plaintiff's and Class Members' personally identifying and addressing information to undisclosed third parties, all without adequate notification to the individual and certainly without any consent, were invasions of Plaintiff's and Class Members' privacy.

66.     The privacy expectation is even greater when personal and sensitive medical information is at stake. Patient healthcare data in the United States is protected by federal law under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), 42 U.S.C. § 1320d-6, and its implementing regulations, which are promulgated by the Department of Health and Human Services ("HHS").

67.     OCR of HHS has expressly stated in its Bulletin to "highlight the obligations" of covered entities, such as BSCA, under the HIPAA Privacy Rule "when using online tracking technologies," such as those used by BSCA, which "collect and analyze information about how internet users are interacting with a regulated entity's website or application." The Bulletin affirmed that cover entities, such as BSCA, violate HIPAA Rules when they use tracking technologies that disclose an individual's identifying information even if the information, such as IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services and even if the individual does not have a relationship with the covered entities, such as BSCA:

---

[14] Benjamin Moskowitz et al., *Privacy Front & Center: Meeting the Commercial Opportunity to Support Consumer Rights*, Consumer Reports in collaboration with Omidyar Network (Fall 2020), https://thedigitalstandard.org/downloads/CR_PrivacyFrontAndCenter_102020_vf.pdf

[15] See https://www.wired.co.uk/article/apple-ios14-facebook ("According to Flurry Analytics, 85 per cent of worldwide users clicked 'ask app not to track' when prompted, with the proportion rising to 94 per cent in the US.").

Class Action Complaint

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

How do the HIPAA Rules apply to regulated entities' use of tracking technologies?

Regulated entities disclose a variety of information to tracking technology vendors through tracking technologies placed on a regulated entity's website or mobile app, including individually identifiable health information (IIHI) that the individual provides when they use regulated entities' websites or mobile apps. This information might include an individual's medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, medical device IDs, or any unique identifying code. All such IIHI collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services. This is because, when a regulated entity collects the individual's IIHI through its website or mobile app, the information connects the individual to the regulated entity (i.e., it is indicative that the individual has received or will receive health care services or benefits from the covered entity), and thus relates to the individual's past, present, or future health or health care or payment for care.

68.     The Bulletin further stated that HIPAA applies to  webpages with tracking technologies of the covered entities, such as BSCA, even on webpages or sites that do not require users to log in:

Tracking on unauthenticated webpages

Regulated entities may also have unauthenticated webpages, which are webpages that do not require users to log in before they are able to access the webpage, such as a webpage with general information about the regulated entity like their location, services they provide, or their policies and procedures. Tracking technologies on regulated entities' unauthenticated webpages generally do not have access to individuals' PHI; in this case, a regulated entity's use of such tracking technologies is not regulated by the HIPAA Rules. However, in some cases, tracking technologies on unauthenticated webpages may have access to PHI, in which case the HIPAA Rules apply to the

regulated entities' use of tracking technologies and disclosures to the tracking technology vendors. Examples of unauthenticated webpages where the HIPAA Rules apply include:

- The login page of a regulated entity's patient portal (which may be the website's homepage or a separate, dedicated login page), or a user registration webpage where an individual creates a login for the patient portal, generally are unauthenticated because the individual did not provide credentials to be able to navigate to those webpages. However, if the individual enters credential information on that login webpage or enters registration information (e.g., name, email address) on that registration page, such information is PHI. Therefore, if tracking technologies on a regulated entity's patient portal login page or registration page collect an individual's login information or registration information, that information is PHI and is protected by the HIPAA Rules.

- Tracking technologies on a regulated entity's unauthenticated webpage that addresses specific symptoms or health conditions, such as pregnancy or miscarriage, or that permits individuals to search for doctors or schedule appointments without entering credentials may have access to PHI in certain circumstances. For example, tracking technologies could collect an individual's email address and/or IP address when the individual visits a regulated entity's webpage to search for available appointments with a health care provider. In this example, the regulated entity is disclosing PHI to the tracking technology vendor, and thus the HIPAA Rules apply.

69. Due to the highly personal and sensitive nature of the Private Information that is input onto and shared on the BSCA Website, Plaintiff and Class members who used the BSCA Website reasonably believed and believe that their interactions and private communications with BSCA were and are confidential and would not be recorded, transmitted to third parties, or monitored for later use. BSCA's unauthorized disclosure of highly personal information and Google's surreptitious interception, storage, and use of Plaintiff's and Class members' private

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

medical information violate Plaintiff's and Class members' privacy interests and rights.

70.    Plaintiff and Class Members have suffered injuries in the form of (i) invasion of privacy; (ii) statutory damages; (iii) the continued and ongoing risk to their personally identifying information that, once out, never can be restored to its previous level of privacy; and (iv) the continued and ongoing risk of harassment, spam and targeted advertisements enabled by Defendant's Website.

## CLASS ACTION ALLEGATIONS

71.    Plaintiff brings this action under Federal Rules of Civil Procedure 23 on behalf of herself and a class (the "BSCA Website Class" or "the Class") defined as follows:

> All California residents who, while located within California at any time during the applicable limitations period preceding the filing of the Complaint in this matter, accessed and viewed BSCA Website and had their IP addresses and/or browser data and/or device data collected by and disclosed to the third-party trackers embedded in BSCA Website.

> California Sub-Class: All California residents who were sent BSCA's "Notice of Data Breach" and who, while located within California at any time during the applicable limitations period preceding the filing of the Complaint in this matter, accessed and viewed BSCA Website and had their IP addresses and/or browser data and/or device data collected by and disclosed to the third-party trackers embedded in BSCA Website

72.    Employees of Defendant and employees of Defendant's parents, subsidiaries and corporate affiliates also are excluded from the Class.  Plaintiff reserves the right to amend or modify the class definition and/or to add sub-classes or limitations to particular issues, where appropriate, based upon subsequently discovered information.

73.    This action properly may be maintained as a class action under the Federal Rules of Civil Procedure because (1) there is a well-defined community of interest in the litigation, (2) common questions of law and fact predominate over individual issues, and (3) the proposed Class is ascertainable.

### Numerosity

74.    BSCA Website Class that Plaintiff seeks to represent contains numerous members and is clearly ascertainable including, without limitation, by using Defendant's records and/or third-party trackers' records to determine the size of the Class and to determine

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

the identities of individual Class Members.

75.    Based on information and belief, BSCA Website Class consists of at least 100 individuals. The Class is so numerous that joinder of all members is impracticable.

**Typicality**

76.    Plaintiff's claims are typical of the claims of all of the other members of BSCA Website Class as Plaintiff has suffered from the same violations of the law as other putative Class Members. Plaintiff's claims and the Class Members' claims are based on the same legal theories and arise from the same unlawful conduct, resulting in the same injury to Plaintiff and all of the other Class Members.

**Adequacy**

77.    Plaintiff will fairly and adequately represent and protect the interests of the other members of the Class. Plaintiff has retained competent counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiff and her counsel are committed to prosecuting this action vigorously on behalf of BSCA Website Class Members and have the financial resources to do so. Neither Plaintiff nor her counsel have any interests that are adverse to the interests of other members of BSCA Website Class.

**Commonality and Predominance**

78.    By its unlawful actions, Defendant has violated Plaintiff's and the Class Members' rights under the CDAFA, CIPA, and the California Constitution. The questions raised are, therefore, of common or general interest to the Class Members, who have a well-defined community of interest in the questions of law and fact presented in this Complaint.

79.    This action involves common questions of law and fact that predominate over any questions affecting only individual Class Members. Those common questions of law and fact include, without limitation, the following:

(a) Whether Plaintiff and Class Members had a reasonable expectation of privacy when they accessed and visited Defendant's BSCA Website during the proposed Class Period;

(b) Whether Defendant knowingly and without permission accessed Plaintiff's and Class Members' computers during the proposed Class Period;

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

(c) Whether Defendant knowingly and without permission altered, damaged, deleted, destroyed, or otherwise used any data from Plaintiff's and Class Members' computers during the proposed Class Period;

(d) Whether Defendant knowingly and without permission took, copied or made use of any data from Plaintiff's and Class Members' computers during the proposed Class Period;

(e) Whether Defendant knowingly and without permission added, altered, damaged, deleted or destroyed any data on or from Plaintiff's and Class Members' computers during the proposed Class Period;

(f) Whether Plaintiff and Class Members had a reasonable expectation of privacy in their personally identifying information, including IP addresses, when they accessed and visited Defendant's BSCA Website during the proposed Class Period;

(g) Whether each of the third-party trackers embedded in Defendant's BSCA website was a "pen register" under California Penal Code § 638.50(b);

(h) Whether, during the proposed Class Period, Defendant had a policy or practice of collecting and sharing personally identifying and addressing information collected on Defendant's BSCA Website including, without limitation, IP addresses and/or browser and device data, with third-party trackers and/or other third parties;

(i) Whether, during the proposed Class Period, Defendant had a policy or practice of not disclosing to BSCA Website users that it would collect and share their personally identifying and addressing information, including IP addresses and/or browser and device data, with third-party trackers and/or other third parties;

(j) Whether, during the proposed Class Period, Defendant had a policy or practice of not obtaining BSCA Website users' prior consent to collect and share personally identifying and addressing information, including IP addresses and/or browser and device data, with third-party trackers and/or other third parties;

(k) Whether Defendant sought or obtained a court order for its use of the third-party trackers;

(l) Whether Defendant's conduct invaded Plaintiff's and Class Members' privacy;

(m) Whether Defendant's acts and practices violated California's Computer Data Access and Fraud Act, Cal. Penal Code § 502;

(n) Whether Defendant's acts and practices violated the California Confidentiality of Medical Information Act, Cal. Civil Code §§ 56.10(a), 56.101(a) and/or 56.36(b);

(o) Whether Defendant's acts and practices violated the California Invasion of Privacy Act, Cal. Penal Code § 638.51(a);

(p) Whether Defendant's acts and practices violated the California Constitution or

Class Action Complaint

individual rights arising under the California Constitution; and

(q) Whether Plaintiff and Class Members are entitled to actual, statutory, nominal and/or other forms of damages, restitution, and other relief.

**Superiority**

80.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all of the members of the Class is impracticable and because questions of law and fact common to BSCA Website Class predominate over any questions affecting only individual members of the Class. Even if every individual member of the Class could afford individual litigation, the court system could not. It would be unduly burdensome to the courts if individual litigation of the numerous cases were to be required. Individualized litigation also would present the potential for varying, inconsistent or contradictory judgments and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues. By contrast, the conduct of this action as a class action with respect to some or all of the issues will present fewer management difficulties, conserve the resources of the court system and the parties, and protect the rights of each member of BSCA Website Class. Further, it will prevent the very real harm that would be suffered by numerous members of the putative Class who simply will be unable to enforce individual claims of this size on their own, and by Defendant's competitors, who will be placed at a competitive disadvantage as their punishment for obeying the law. Plaintiff anticipates no difficulty in the management of this case as a class action.

81.     The prosecution of separate actions by individual members of BSCA Website Class would create a risk of adjudications with respect to them that, as a practical matter, would be dispositive of the interests of other members of the Class who are not parties to those adjudications or that would substantially impair or impede the ability of those non-party members of the Class to protect their interests.

82.     The prosecution of individual actions by members of BSCA Website Class also would run the risk of establishing inconsistent standards of conduct for Defendant.

**FIRST CLAIM FOR RELIEF**
**Violation of the California Computer Data Access and Fraud Act**
**California Penal Code § 502**
(On Behalf of Plaintiff and the Class)

83.    Plaintiff incorporates each allegation set forth above as if fully set forth herein and further allege as follows.

84.    The California Legislature enacted the CDAFA with the intent to "expand the degree of protection afforded to individuals, businesses, and governmental agencies from tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems." Cal. Penal Code § 502(a).

85.    The Legislature further declared that "protection of the integrity of all types and forms of lawfully created computers, computer systems, and computer data is vital to the protection of the privacy of individuals as well as to the well-being of financial institutions, business concerns, governmental agencies, and others within this state that lawfully utilize those computers, computer systems, and data." Cal. Penal Code § 502(a).

86.    For purposes of the statute, a number of definitions were provided. The term "access" means to "gain entry to, instruct, cause input to, cause output from, cause data processing with, or communicate with, the logical, arithmetical, or memory function resources of a computer, computer system, or computer network." Cal. Penal Code § 502(b)(1).

87.    The term "computer program or software" is defined as "a set of instructions or statements, and related data, that when executed in actual or modified form, cause a computer, computer system, or computer network to perform specified functions." Cal. Penal Code § 502(b)(3).

88.    The term "computer system" refers to "a device or collection of devices, including support devices and excluding calculators that are not programmable and capable of being used in conjunction with external files, one or more of which contain computer programs, electronic instructions, input data, and output data, that performs functions, including but not limited to, logic, arithmetic, data storage and retrieval, communication, and control." Cal. Penal Code § 502(b)(5).

Class Action Complaint

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

89.      Plaintiff's and Class Members' web browsers used to access BSCA website are "computer software." The computers on which Plaintiff and Class Members used their web browsers constitute computers or "computer systems" within the scope of the CDAFA.

90.      The statute also defines the term "data" broadly to mean a "representation of information, knowledge, facts, concepts, computer software, or computer programs or instructions." The statute further provides that data may be in "any form, in storage media, or as stored in the memory of the computer or in transit or presented on a display device." Cal. Penal Code § 502(b)(8).

91.      As discussed above, a website cookie, including a third-party tracker cookie, and an IP address both are "data" within the meaning of the statute.

92.      Under California Penal Code § 502(c)(1), it is unlawful knowingly to access and without permission alter, damage, delete, destroy, or otherwise use any data, computer, computer system, or computer network in order to…wrongfully control or obtain money, property or data. Cal. Penal Code § 502(c)(1).

93.      The statute also makes it unlawful knowingly to access and without permission take, copy, or make use of any data from a computer, computer system, or computer network. Cal. Penal Code § 502(c)(2).

94.      The CDAFA further prohibits any person from knowingly accessing and without permission adding, altering, damaging, or destroying any data, computer software, or computer programs which reside or exist internal or external to a computer, computer system, or computer network. Cal. Penal Code § 502(c)(4).

95.      Under subsections (6) and (7) of Penal Code § 502(c), a person also may not knowingly and without permission (i) provide or assist in providing a means of accessing or (ii) access or cause to be accessed any computer, computer system or computer network. Cal. Penal Code §§ 502(c)(6) and (7).

96.      Based on Defendant's unauthorized installation and storage of third-party tracker cookies on Plaintiff's and Class Members' web browsers during the proposed Class Period, as alleged above, Defendant knowingly accessed and without permission altered and

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

used Plaintiff's and Class Members' data and computer systems in violation of Penal Code § 502(c)(1).

97.     Similarly, the installation of those third-party tracker cookies violated subsection (c)(4) because Defendant added and altered data and computer software on Plaintiff's and Class Members' computers or computer systems. Cal. Penal Code § 502(c)(4).

98.     By installing third-party tracker cookies, Defendant also knowingly and without permission provided those trackers a means of accessing and/or caused to be accessed Plaintiff's and Class Members' computers, computer systems and/or computer networks in violation of Penal Code §§ 502(c)(6) and (7).

99.     Further, Defendant's unauthorized collection and disclosure of Plaintiff's and Class Members' personally identifying and addressing information to undisclosed third parties during the proposed Class Period violated Penal Code § 502(c)(2) because Defendant took and made use of data, including IP addresses and browser and device data, from Plaintiff's and Class Members' computers, computer systems, or computer networks.

100.     Plaintiff and Class Members are residents of California and used their computers, computer systems and/or computer networks in California. Defendant accessed or caused to be accessed Plaintiff's and Class Members' data and other personally identifying information from within California.

101.     Defendant was unjustly enriched by accessing, acquiring, taking and using Plaintiff's and Class Members' data and computer systems during the proposed Class Period without their permission or consent and by using all of that identifying information to maximize revenue from selling advertising space on Defendant's BSCA website for Defendant's own financial benefit. Defendant has been unjustly enriched in an amount to be determined at trial.

102.     As a direct and proximate result of Defendant's violations of the CDAFA, Plaintiff and Class Members have suffered damages. Under Penal Code § 502(e)(1), Plaintiff and Class Members are entitled to compensatory damages, injunctive relief and other equitable relief in an amount to be determined at trial.

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

103.   Plaintiff and Class Members also are entitled to an award of reasonable attorneys' fees and costs under Penal Code § 502(e)(2).

**SECOND CLAIM FOR RELIEF**
**Unlawful Use of a Pen Register or Trap and Trace Device**
**California Penal Code § 638.51**
(On Behalf of Plaintiff and the Class)

104.   Plaintiff incorporates each allegation set forth above as if fully set forth herein and further allege as follows.

105.   The California Legislature enacted the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq*. ("CIPA"), to address "advances in science and technology [that] have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." *Id*. § 630. CIPA is intended "to protect the right of privacy of the people of this state." *Id*.

106.   Although CIPA was enacted before the dawn of the Internet, the California Supreme Court "regularly reads statutes to apply to new technologies where such a reading would not conflict with the statutory scheme." *In re Google Inc.*, 2013 WL 5423918, at *21 (N.D. Cal. Sept. 26, 2013); *see also Greenley*, 2023 WL 4833466, at *15 (referencing CIPA's "expansive language" when finding that software was a "pen register"); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, [CIPA] Section 631(a) applies to Internet communications."). This is consistent with the observation in *Matera v. Google Inc*. that, "when faced with two possible interpretations of CIPA, the California Supreme Court has construed CIPA in accordance with the interpretation that provides the greatest privacy protection." *Matera v. Google Inc.*, 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016).

107.   Particularly pertinent here, California Penal Code § 638.51(a) makes it unlawful for a person to "install or use a pen register or a trap and trace device without first obtaining a court order."

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

108.    A "pen register" is "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

109.    A "trap and trace device" is a "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c).

110.    In essence, a "pen register" is a "device or process" that records outgoing information, while a "trap and trace device" is a "device or process" that records incoming information. For example, if a user sends an email, a "pen register" might record the email address from which the email was sent, the email address to which the email was sent, and the subject line – because this is the user's outgoing information. On the other hand, if that same user receives an email, a "trap and trace device" might record the email address from which that email was sent, the email address to which it was sent, and the subject line – because this is incoming information that is being sent to that same user.

111.    The th tracker embedded in Defendant's BSCA website – Google Analytics  – is a "pen register" because it is a device or process that captures and records outgoing addressing or signaling information from the electronic communications transmitted by Plaintiff's and Class Members' computers, computer systems, and computer networks as they are accessing and visiting Defendant's BSCA website.

112.    At all relevant times during the proposed Class Period, Defendant installed Google Analytics on Plaintiff's and Class Members' web browsers and used Google Analytics to collect Plaintiff's and Class Members' IP addresses and/or browser and device data. IP addresses constitute addressing information. *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1108 (9th Cir. 2014).

113.    Unaware of Defendant's installation and use of the third-party trackers as pen

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

registers during the proposed Class Period, Plaintiff and Class Members could not have provided and did not provide their prior consent to Defendant's installation or use of the third-party trackers or pen registers.

114.   Upon information and belief, Defendant was not authorized by any court order to use a pen register to track Plaintiff's and Class Members' location data and other identifying information.

115.   Defendant's conduct as described above violated California Penal Code § 638.51. As a result, Defendant is liable for the relief sought by Plaintiff and BSCA Website Class. Under California Penal Code § 637.2, Plaintiff and Class Members are entitled to and seek statutory damages of $5,000 for each of Defendant's CIPA violations during the Class Period, and three times the amount of actual damages, if any.

### THIRD CLAIM FOR RELIEF
**Aiding and Abetting Unlawful Interception**
**Violations of California Penal Code § 631**
(On Behalf of Plaintiff and the Class)

116.   Plaintiff incorporates each allegation set forth above as if fully set forth herein and further allege as follows.

117.   California Penal Code § 631 prohibits (i) any person who, by means of any machine, instrument, or contrivance, or in any other manner, intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or (ii) willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state, or (iii) uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or (iv) aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

done any of the acts or things mentioned in this section.

118.    BSCA and Google are each a "person" for the purposes of CIPA.

119.    BSCA systematically and routinely does business in California with California residents and California health providers. Google maintains its principal place of business in California, where it designed, contrived, agreed to, conspired to achieve, effectuated, and/or received the interception and use of the contents of Plaintiff's and Class members' Private Information containing PII and PHI. Additionally, Google intercepted Plaintiff's and Class members' data and confidential communications in California, where Plaintiff, Class members and Google all are located.

120.    BSCA's Tracking Technologies embedded into the BSCA website including Google Analytics, Plaintiff's and Class members' web browsers, and Plaintiff's and Class members' computing and mobile devices are all a "machine, instrument, or contrivance…or other manner," under California Penal Code § 631(a).

121.    By using Tracking Technologies embedded into the BSCA website including Google Analytics and allowing Google, without Plaintiff's and Class members' consent, to intercept and access the BSCA Website users' Private Information and confidential communications, BSCA permitted Google contemporaneously to read or attempt to read, and/or to learn the contents or meaning of, Plaintiff's and Class members' sensitive communications with BSCA while the communications were in transit or passing over any wire, line or cable, or were being received at any place within California.

122.    Google used, or attempted to use, the private communications and information it received through Google Analytics, including to improve Google's own advertising and analytics services and to create new technologies and offerings.

123.    The interception of Plaintiff's and Class members' personal and private communications was not authorized or consented to by Plaintiff or Class members. BSCA cannot show that it had Plaintiff's and Class members' consent to allow Google to intercept and access the BSCA Website users' Private Information and confidential communications, in

- 34 -

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

violation of California Penal Code § 631(a). Accordingly, the interception by Google was unlawful and BSCA aided and abetted Google's unlawful conduct.

124.    BSCA's conduct as described above violated California Penal Code § 631(a). As a result, Defendant is liable for the relief sought by Plaintiff and BSCA Website Class. Under California Penal Code § 637.2, Plaintiff and Class Members are entitled to and seek statutory damages of $5,000 for each of Defendant's CIPA violations during the Class Period. Under California Penal Code § 637.2, Plaintiff and each of the Class members therefore are entitled to $5,000 in statutory damages for each of Defendant's CIPA violations during the Class Period, and three times the amount of actual damages, if any.

## FOURTH CLAIM FOR RELIEF
### Unlawful Recording of and Eavesdropping Upon Confidential Communications
### Violations of California Penal Code § 632
(On Behalf of the Plaintiff and the Class)

125.    Plaintiff incorporates each allegation set forth above as if fully set forth herein and further allege as follows.

126.    California Penal Code § 632(a) prohibits using "A person who, intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio."

127.    BSCA's Tracking Technologies embedded into the BSCA website is an electronic amplifying or recording device for purposes of California Penal Code § 632. For example, Google Analytics code records a user's interaction in real-time as the user navigates the page, including recording any information that the user may input and the links that the user clicked. The measurement code also collects and records information from the browser, such as the language setting, the type of browser and the device and operating system on which the browser is running

128.    California Penal Code § 632(c) defines a "confidential communication" to

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

include "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto."

129.    Plaintiff and Class members' personal and private communications with BSCA, including their submission of sensitive medical information such as their mental health symptoms, conditions and concerns, health insurance information, provider and treatment preferences, and dates and locations of medical appointments, were confidential communications for purposes of California Penal Code § 632.

130.    Because BSCA did not disclose to Plaintiff or to the Class members that their private communications containing protected medical information were being recorded and/or eavesdropped upon by Google, BSCA did not obtain, and could not have obtained, Plaintiff's or the Class members' express or implied advance consent to Google's recording or monitoring of those communications. As a result, Plaintiff and the Class members had an objectively reasonable expectation that their confidential communications were not being recorded and/or eavesdropped upon by Google. That expectation and its objective reasonableness arise, in part, from the objective offensiveness of surreptitiously recording and/or eavesdropping upon people's private communications and the ease with which a disclosure could have been put in place.

131.    Plaintiff and Class members expected that their personal and private communications with BSCA would not be intercepted and secretly recorded and/or eavesdropped upon.

132.    By contemporaneously redirecting and transmitting Plaintiff's and Class members' confidential communications through Google Analytics website tracking technology, BSCA permitted Google to eavesdrop upon and/or record BSCA website users' confidential communications through an electronic amplifying or recording device. By so doing, BSCA violated California Penal Code § 632(a).

133.    At no time did Plaintiff or Class members consent to BSCA's and Google's unlawful conduct. Nor could Plaintiff or Class members reasonably expect that their

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

confidential communications with BSCA would be overheard or recorded by Google, especially in the absence of any disclosure in BSCA's Privacy Policy.

134.   Upon information and belief, Google utilized Plaintiff's and Class members' sensitive personal information, including their protected mental health information, for Google's own purposes, including improving Google's advertising and analytics services offerings and revenue.

135.   BSCA's conduct as described above violated California Penal Code § 632(a). As a result, Defendant is liable for the relief sought by Plaintiff and BSCA Website Class. Under California Penal Code § 637.2, Plaintiff and Class Members are entitled to and seek statutory damages of $5,000 for each of Defendant's CIPA violations during the Class Period. Under California Penal Code § 637.2, Plaintiff and each of the Class members therefore are entitled to $5,000 in statutory damages for each of Defendant's CIPA violations during the Class Period, and three times the amount of actual damages, if any.

## FIFTH CLAIM FOR RELIEF

### Violations of California Confidentiality of Medical Information Act
### California Civil Code §§ 56.06, 56.101, 56.10 and 56.36

(On Behalf of the Plaintiff and the California Sub-Class)

136.   Plaintiff incorporates each allegation set forth above as if fully set forth herein and further allege as follows.

137.   At all times relevant to this action, BSCA is considered a "health care service plan" within the meaning of California Civil Code § 56.05(g), a "provider of health care" within the meaning of California Civil Code §§ 56.05(p) and 56.06(a) & (b), and maintained and continues to maintain "medical information" within the meaning of Civil Code § 56.05(j), of Plaintiff and the California Sub-Class.

138.   Plaintiff and the other members of the California Sub-Class are "patients" within the meaning of Civil Code § 56.05(m).

139.   At all times relevant to this action, BSCA negligently created, maintained,

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

preserved, and/or stored Plaintiff's and the Class' medical information, including Plaintiff's and the California Sub-Class' names, addresses, diagnosis/treatment information and treatment cost information, in electronic form, onto BSCA's computer server in a manner that did not preserve the confidentiality of the information, and negligently failed to protect and preserve confidentiality of electronic medical information of Plaintiff and the Class in its possession, as required by the CMIA, and specifically, under Civil Code §§ 56.06(d), 56.10(a), and 56.101(a). The information that is submitted and shared by BSCA Website users and collected, maintained, and disclosed by BSCA is medical information because it is individually identifiable information relating to a patient's medical condition and plan of treatment, including but is not limited to BSCA Website users' (1) name and address information, (2) health insurance information and coverage, (3) health symptoms, diagnosis, conditions and concerns, (4) the reasons for seeking treatment, and (5) health provider and treatment preferences.

140. As a provider of software and/or Website services that facilitates the diagnosis, treatment, and management of a medical condition, BSCA is deemed to be a provider of health care and is subject to the standards of confidentiality with respect to medical information disclosure that are required by the CMIA. As alleged in detail above, through the use of Google Analytics website tracking technology embedded on BSCA's website, BSCA knowingly shared Plaintiff's and Class members' medical information with and disclosed that information to third party Google (and possibly others) without Plaintiff's and Class members' knowledge or consent. In so doing, BSCA violated Cal. Civ. Code § 56.06(f) by failing to maintain the confidentiality of users' private and personal medical information.

141. BSCA also violated Cal. Civ. Code § 56.101(a) by failing to maintain, preserve, and store medical information in a manner that preserves the confidentiality of the information. Instead, BSCA allowed third-party Google (and possibly others) to intercept and otherwise access Plaintiff's and Class members' private medical information on BSCA's Website, which Google used for its own purposes including improving and creating new marketing and analytics services for itself.

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

142.    California Civil Code § 56.10(a) further provides that a provider of health care "shall not disclose medical information regarding a patient of the provider of health care or an enrollee or subscriber of a health care service plan without first obtaining an authorization." BSCA violated this section of the CMIA when it disclosed Plaintiff's and Class members' medical information to undisclosed third-party Google (and possibly others) without first obtaining Plaintiff's and the Class members' authorization to do so. Nowhere on its Website does BSCA identify Google as a recipient of users' highly personal and sensitive data, including protected mental health information, nor does BSCA ask for user consent to share or disclose information to Google.

143.    BSCA's conduct, as described above, violated California Civil Code §§ 56.06, 56.101, and 56.10. Due to BSCA's negligent creation, maintenance, preservation and/or storage of Plaintiff's and the Class members' medical and personal identifying information on BSCA's Website, BSCA allowed Plaintiff's and the Class' medical information, including Plaintiff's and the Class' names, addresses, dates of birth, diagnosis/treatment information and treatment cost information, in electronic form, to be accessed and actually viewed by at least one unauthorized third party, without first obtaining an authorization, constituting a disclosure in violation of Civil Code §§ 56.06(d), 56.10, and 56.101(a).

144.    Due to BSCA's negligent creation, maintenance, preservation and/or storage of Plaintiff's and the Class members' medical and personal identifying information on BSCA's Website, BSCA allowed Plaintiff's and the Class' medical information, including Plaintiff's and the Class' names, addresses, dates of birth, diagnosis/treatment information and treatment cost information, in electronic form, to be accessed and actually viewed by at least one unauthorized third party, constituting a release in violation of Civil Code § 56.101(a).

145.    As a result of BSCA's above-described conduct in violation of the CMIA, Plaintiff and the Class have suffered damages from the unauthorized disclosure and/or release of their medical and personal identifying information made unlawful by Civil Code §§ 56.06(d), 56.10(a), and 56.101(a).

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

146.    As a result of BSCA's above-described conduct in violation of the CMIA, Plaintiff and the Class seek nominal damages of one thousand dollars ($1,000) for each violation under Civil Code §56.36(b)(1), and actual damages suffered, according to proof, for each violation under Civil Code § 56.36(b)(2).

**THIRD CLAIM FOR RELIEF**
**Invasion of Privacy**
**Violation of Art. 1, § 1, California Constitution**
(On Behalf of Plaintiff and the Class)

147.    Plaintiff incorporates each allegation set forth above as if fully set forth herein and further allege as follows.

148.    "Privacy" is listed in Article I, Section 1, of the California Constitution as one of six fundamental rights of all Californians. That section of the Constitution provides as follows: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." Cal. Const. Art. I, § 1.

149.    The right to privacy in California's Constitution creates a right of action against private entities such as Defendant. To state a claim for invasion of privacy under the California Constitution, a plaintiff must establish (1) a legally protected privacy interest; (2) a reasonable expectation of privacy; and (3) an intrusion so serious in nature, scope and actual or potential impact as to constitute an egregious breach of social norms.

150.    Plaintiff and Class Members had a legally protected privacy interest in their personally identifying information and addressing information that was captured during the proposed Class Period, without notice or consent, when they accessed and viewed Defendant's BSCA website. These privacy interests are recognized by the California Constitution, CDAFA, CMIA, CIPA, HIPAA, and numerous other statutes.

151.    Plaintiff and Class members had a reasonable expectation of privacy under the circumstances, including that: (i) the private communications disclosed by BSCA and intercepted by Google include personal and sensitive information related to Plaintiff's and Class members' identities and health conditions and treatment; and (ii) Plaintiff and Class

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

members did not consent to BSCA disclosing or otherwise authorize BSCA to disclose their private and confidential PII and PHI to Google or other third party interceptors, nor did they authorize Google to intercept, store, or use their Private Information for Google's own benefit and monetary gain. During the proposed Class Period, Plaintiff and Class Members were not aware and could not reasonably have expected that Defendant would use website tracking technology and install third-party tracker cookies without notice and without obtaining consent.

152.    Defendant's unauthorized (1) installation of third-party tracker cookies and (2) collection and disclosure to unknown third parties of Plaintiff's and Class Members' Private Information during the proposed Class Period, all without consent or adequate notification to Plaintiffs and Class Members, were invasions of Plaintiff's and Class Members' privacy.

153.    BSCA's conduct constituted a serious invasion of privacy that would be highly offensive to a reasonable person in that: (i) the information disclosed by BSCA and intercepted and collected by Google was highly sensitive and personal information protected by the California Constitution and numerous California and federal statutes including the CMIA; (ii) BSCA did not have authorization or consent to disclose that PII and PHI to any third party interceptor, including Google, and Google did not have authorization to collect that highly sensitive Private Information; and (iii) the invasion deprived Plaintiff and Class members of the ability to control the dissemination and circulation of that information, which is considered a fundamental right to privacy. Defendant's conduct constitutes a severe and egregious breach of social norms.

154.    As a direct and proximate result of Defendant's actions, Plaintiff and Class Members have had their privacy invaded and have sustained injury, including injury to their peace of mind.

155.    Plaintiff and BSCA Website Class Members seek appropriate relief for that injury, including but not limited to restitution, disgorgement of profits earned or received by Defendant as a result of or in connection with the intrusions upon Plaintiff's and Class Members' privacy, nominal damages, and any and all other equitable relief that will compensate Plaintiff and Class Members properly for the harm to their privacy interests.

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

156.    Plaintiff also seeks such other relief as the Court may deem just and proper.

## FOURTH CLAIM FOR RELIEF
### Unjust Enrichment
(On Behalf of Plaintiff and the Class)

157.    Plaintiff incorporates each allegation set forth above as if fully set forth herein and further allege as follows.

158.    Defendants received benefits from Plaintiff and Class Members and unjustly retained those benefits at their expense.

159.    Plaintiff and Class Members conferred a benefit upon Defendant in the form of valuable personal information and data that Defendant collected from Plaintiff and Class Members, without authorization and proper compensation. Defendant has collected, disclosed, and otherwise misused this information for its own gain, providing Defendant with economic, intangible, and other benefits, including substantial monetary compensation from third parties who received Plaintiff' and Class Members' personal information and data.

160.    Defendant unjustly retained those benefits at the expense of Plaintiff and Class Members because Defendant's conduct damaged Plaintiff and Class Members, all without providing any commensurate compensation to Plaintiff and Class Members.

161.    The benefits that Defendant derived from Plaintiff and Class Members rightly belong to Plaintiff and Class Members. It would be inequitable under unjust enrichment principles in California and every other state for Defendant to be permitted to retain any of the profit or other benefits they derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

162.    Defendant should be compelled to disgorge in a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

## FIFTH CLAIM FOR RELIEF
### Violations of California's Unfair Competition Law
### Cal. Bus. & Prof. Code §§ 17200, *et seq*.
(On Behalf of Plaintiff and the Class)

163.    Plaintiff incorporates each allegation set forth above as if fully set forth herein

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

Class Action Complaint

and further allege as follows.

164. Defendant's business acts and practices are "unlawful" under the California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq*. ("UCL"), because, as alleged above, Defendant violated the California common law, California Constitution, and the other State and Federal statutes and causes of action described herein.

165. Defendant's business acts and practices are "unfair" under the UCL. California has a strong public policy of protecting consumers' privacy interests, including protecting consumers' personal data. Defendant violated this public policy by, among other things, surreptitiously collecting, disclosing, and otherwise misusing Plaintiff's and Class Members' personal information and data without Plaintiff's and Class Members' consent. Defendant's conduct violates the policies of the statutes referenced herein.

166. Defendant's business acts and practices are also "unfair" in that they are immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers. The gravity of the harm of Defendant secretly collecting, disclosing, and otherwise misusing Plaintiff's and Class Members' personal information and data is significant, and there is no corresponding benefit resulting from such conduct. Finally, because Plaintiff and Class Members were completely unaware of Defendant's conduct, they could not have possibly avoided the harm.

167. Defendant's violations were, and are, willful, deceptive, unfair, and unconscionable.

168. Had Plaintiff and Class Members known that their information would be collected, and otherwise misused for Defendant's own benefit, they would not have used Defendant's website.

169. Plaintiff and Class Members have a property interest in their sensitive personal data. By surreptitiously collecting and otherwise misusing Plaintiff's and Class Members' information, Defendant has taken property from Plaintiff and Class Members without providing just or any compensation.

170. For these reasons, Plaintiff seeks restitution from Defendant on behalf of herself

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

- 43 -

and Class Members; and injunctive relief in the form of a permanent injunction enjoining Defendant's unlawful and unfair business activities, including an injunction terminating all downstream distributions of Plaintiff's and the Class Members' personal data illegally collected; and any other equitable relief the Court deems proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and the members of the Class, pray for the following relief:

a. An order certifying BSCA Website Class, appointing Plaintiff Belinda Foley as representatives of BSCA Website Class, and appointing counsel for Plaintiff as counsel for BSCA Website Class;

b. An order declaring that Defendant's actions, as described above, violated California Penal Code § 502;

c. An order declaring that Defendant's actions, as described above, violated California Penal Code §§ 638.51, 631 and 632;

d. An order declaring that Defendant's actions, as described above, violated California Civil Code §§ 56.06, 56.101, 56.10 and 56.36.

e. An order declaring that Defendant's actions, as described above, violated Art. 1, § 1 of the California Constitution;

f. A judgment for and award of compensatory damages and/or other equitable relief under California Penal Code § 502(e)(1) to Plaintiff and each of the Members of BSCA Website Class;

g. For each violation of CIPA, a judgment for and award of statutory damages of $5,000 and actual damages, if any, under California Penal Code § 637.2 to Plaintiff and each of the Members of BSCA Website Class;

h. For each violation of CMIA, a judgment for and award of statutory damages of $1,000 per violation under California Civil Code § 56.36(b)(1) and actual damages, if any, under California Civil Code § 56.36(b)(2) to Plaintiff and each of the members of the California Sub-Class.

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

i.  A judgment for and award of restitution, disgorgement of profits, and nominal damages to which Plaintiff and all of the Members of BSCA Website Class are entitled by law;

j.  Payment of costs of the suit;

k.  Payment of attorneys' fees under California Code of Civil Procedure § 1021.5, California Civil Code § 56.35, and California Penal Code § 502(e)(2);

l.  An award of pre-judgment and post-judgment interest to the extent allowed by law; and

m. Such other and/or further relief as the Court may deem proper.

COHELAN KHOURY & SINGER

By:  s/ Timothy D. Cohelan
Isam C. Khoury, Esq.
Dated: April 16, 2025                Attorneys for Plaintiff BELINDA FOLEY

KEEGAN & BAKER, LLP

By:  s/ Patrick N. Keegan
Patrick N. Keegan, Esq.
Attorneys for Plaintiff BELINDA FOLEY

## DEMAND FOR JURY TRIAL

Plaintiff and the Class hereby demand a jury trial on all causes of action and claims with respect to which they have a right to jury trial.

COHELAN KHOURY & SINGER
By:  s/ Timothy D. Cohelan
Isam C. Khoury, Esq.
Attorneys for Plaintiff BELINDA FOLEY

Dated: April 16, 2025

KEEGAN & BAKER, LLP

By:  s/ Patrick N. Keegan
Patrick N. Keegan, Esq.
Attorneys for Plaintiff BELINDA FOLEY

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101